```
                                                                USDC SDNY
                                                                DOCUMENT
                                                                ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                                    DOC #: _____
SOUTHERN DISTRICT OF NEW YORK                                   DATE FILED: 6/9/2015
------------------------------------------------------------X
 BRIDGET MARKS, as PERSONAL            :
 REPRESENTATIVE OF THE ESTATE OF       :
 ALVIN M. MARKS,                       :
                                       :
                                       :   1:14-cv-8965-GHW
                           Plaintiff,  :
                                       :   MEMORANDUM
             -v -                      :   OPINION AND ORDER
                                       :
 ENERGY MATERIALS CORPORATION and      :
 RACHEL SCALABRINI,                    :
                                       :
                          Defendants.  :
------------------------------------------------------------X
```

GREGORY H. WOODS, United States District Judge:

Plaintiff Bridget Marks, as the Personal Representative of the Estate of Alvin Marks ("Plaintiff" or "the Estate"), brought this diversity action raising state law claims of conversion, misappropriation of trade secrets, and unjust enrichment against defendant Energy Materials Corporation ("EMC"), as well as a claim of conversion against defendant Rachel Scalabrini. EMC moves to dismiss Plaintiff's claims against it for failure to state a cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6). Ms. Scalabrini separately moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the following reasons, the Court concludes that Plaintiff has failed to adequately plead a claim of conversion, misappropriation of trade secrets, or unjust enrichment against EMC. The Court further concludes that Ms. Scalabrini is not entitled to judgment on the pleadings. Accordingly, EMC's motion to dismiss is granted and Ms. Scalabrini's motion for judgment on the pleadings is denied.

I.  Background

According to the allegations in Plaintiff's amended complaint, Dr. Alvin Marks was an inventor who, among other things, developed and patented "Lumeloid" and "Quensor" energy conversion and storage technologies. *See* Dkt. No. 24 (First Amended Complaint ("FAC")), ¶¶ 16-

20. Dr. Marks documented his work on those technologies in laboratory notebooks to which the public did not have access. *Id.* ¶ 21.

Dr. Marks passed away in May 2008, at which point his property became part of the Estate. *Id.* ¶¶ 22-23. Dr. Marks's will was filed with the Worcester County Probate and Family Court in October 2008, but was not probated. *See In the Matter of Alvin M. Marks*, Worcester County Probate and Family Court, Case No. WO07P0197WF1, 10/21/2008 Dkt. Entry.[1] The will named Gerard J. Aitken IV, Dr. Marks's third wife's son from a subsequent marriage, as the Executor of the Estate. FAC ¶¶ 2, 9.[2]

On January 12, 2010, Aitken, in his individual capacity, entered into a Technology Purchase Agreement ("TPA") with defendant EMC, a Delaware corporation formed to develop and commercialize solar conversion and energy storage products based on technologies invented by Dr. Marks. *Id.* ¶¶ 10-11, 24. Pursuant to the TPA, Aitken purported to sell to EMC "all rights in intellectual property relating to Lumeloid," "an option to purchase all rights in intellectual property relating to Quensor," and all "tangible embodiments" of the intellectual property relating to those technologies, including Dr. Marks's laboratory notebooks (collectively, the "Estate Property"). *Id.* ¶¶ 25-27. In exchange, EMC issued Aiken 2,500,000 shares of its common stock. *Id.* ¶ 30.

Aitken explicitly represented and warranted in the TPA that he "exclusively own[ed] all right, title and interest in and to the [Estate Property] . . . free and clear of all liens, security interests or any other encumbrances." *See* Dkt. No. 36, Ex. B ("TPA"), ¶ 4.2(b).[3] Nonetheless, according to Plaintiff, "EMC knew or should have known that Aitken had no authority to transact with respect to

---

[1] The Court may take judicial notice of such public records in related court proceedings in ruling on a motion to dismiss. *See Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011)

[2] Apart from the above fact, which is referenced in the amended complaint, the parties dispute whether the Court may consider the content of Dr. Marks's will in deciding the instant motions. The Court need not resolve this dispute, as considering the content of the will would not change the outcome of this decision.

[3] Because the TPA is both incorporated by reference in and "integral" to the amended complaint, the Court may consider it in deciding the instant motions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

the Estate Property." FAC ¶ 39. In support of this assertion, Plaintiff alleges that, "given EMC's knowledge that Aitken was not biologically related to the Decedent and that the purported will left nothing to the Decedent's kin, EMC was on notice of the need to conduct commercially reasonable due diligence into Aitken's purported authority to transact with respect to the Estate Property." *Id.* ¶ 41. Plaintiff further alleges that "[t]he exercise of commercially reasonable due diligence would have revealed that Aitken had not been appointed the Executor of Dr. Marks Estate as of January 12, 2010, and that the Estate's property had not been distributed to the heirs." *Id.* ¶ 40; *see also id.* ¶ 5 ("Whether a will has been admitted to probate in Massachusetts, or an executor or personal representative appointed, is easily obtainable public information."). Plaintiff claims that "EMC's failure to conduct commercially reasonable due diligence amounts to willful blindness and reflects its bad faith interest in obtaining the Estate Property without regard to Aitken's authority to transact with respect to that property." *Id.* ¶ 42.

After entering into the TPA, EMC took possession of several of Dr. Marks's laboratory notebooks. *Id.* ¶ 28. According to Plaintiff, "[t]he information contained in Dr. Marks' laboratory notebooks relating to Dr. Marks' continuing efforts and research with respect to the technology was a trade secret in that it was valuable, was not available to the public, and had always been kept secret by Dr. Marks during his lifetime and through the time of EMC's purported purchase of the laboratory notebooks." *Id.* ¶ 45. Plaintiff alleges that "EMC derived commercial advantage from the trade secret information in Dr. Marks' laboratory notebooks relating to [his] continuing efforts and research with respect to the technology." *Id.* ¶ 47. Relatedly, Plaintiff alleges that "EMC reaped significant benefits from [its] transaction with Aitken, both in terms of the actual Estate Property [it] received, and in terms of the enhancement of [its] ability to raise funds on the basis of its purported relationship with Dr. Marks and purported rights to his technology." *Id.* ¶ 50.

In April 2011, Aitken filed a petition to appoint himself Executor of the Estate and to probate Dr. Marks's will. *See In the Matter of Alvin M. Marks,* Worcester County Probate and Family

Court, Case No. WO07P0197EP1, 4/4/2011 Dkt. Entry. Bridget Marks, Dr. Marks's daughter and Aitken's half-sister, subsequently challenged the validity of both the will and Aitken's petition. *Id.* at 8/15/2011 Dkt. Entry. In a January 2013 summary judgment decision, the Probate Court determined that there was a significant question as to whether Aitken exercised improper influence over Dr. Marks in drafting his will. *Id.* at 1/15/2013 Dkt. Entry.[4] Aitken thereafter abandoned his request to be appointed Executor of the Estate. Bridget Marks filed a Petition for Formal Probate and was appointed Personal Representative of the Estate in February 2014. *Id.* at 12/30/2013 and 3/3/2014 Dkt. Entries.

Meanwhile, in January 2012, defendant Rachel Scalabrini, Aitken's ex-wife, entered into a marital separation agreement ("MSA") with Aitken pursuant to which Aitken agreed to transfer to Ms. Scalabrini half of his shares of EMC, *see* Dkt. No. 30 (Scalabrini Answer), attached MSA at 5,[5] which included at least some of the shares he had obtained through the TPA, FAC ¶ 35. In March 2013, the New York Supreme Court, Westchester County, issued a judgment of divorce (the "Divorce Decree") finalizing Ms. Scalabrini's divorce from Aitken, which explicitly incorporated but did not merge the MSA. *See* Dkt. No. 30, attached Judgment of Divorce at 2. On December 29, 2014, Plaintiff demanded that Ms. Scalabrini return to the Estate the shares of EMC that Aitken had obtained through the TPA. FAC ¶ 36. Ms. Scalabrini refused to do so on the same date. *Id.*

## II.     Procedural History

In October 2014, Plaintiff filed a complaint in New York state court raising claims of conversion, misappropriation of trade secrets, and unjust enrichment against EMC only. *See* Dkt.

---

[4] The Probate Court's summary judgment decision has not been provided by the parties and is not available electronically. Plaintiff, however, has not disputed the above characterization of that decision, which is derived from EMC's motion papers, and which is offered solely for the sake of context.

[5] In deciding Ms. Scalabrini's motion for judgment on the pleadings, the Court may consider the documents attached to her answer. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Furthermore, Plaintiff has consented to the Court's consideration of the documents attached to Ms. Scalabrini's answer. *See* Dkt. No. 49 at 1 n.1.

No. 2, Ex. C.  EMC timely removed the action to this Court, invoking the Court's diversity jurisdiction.  *See* Dkt. No. 2.

EMC moved to dismiss Plaintiff's complaint under Rule 12(b)(6) in December 2014, raising arguments substantially similar to the arguments described below.  *See* Doc. 20.  In response to EMC's motion, Plaintiff filed an amended complaint that attempted to cure the deficiencies identified by EMC and that added a conversion claim against Ms. Scalabrini.  *See* FAC.  Ms. Scalabrini subsequently appeared *pro se* and answered the amended complaint.  *See* Dkt. No. 30.

EMC now moves to dismiss the amended complaint as to Plaintiff's claims against it under Rule 12(b)(6), while Ms. Scalabrini moves for judgment on the pleadings under Rule 12(c).  EMC argues, *inter alia*, that, because Plaintiff did not sufficiently allege that EMC was anything other than an innocent purchaser of the purportedly converted property, Plaintiff was required to and did not allege that the Estate demanded the return of that property.  *See* Dkt. No. 37 ("EMC Mot.") at 21-24.  EMC further argues that Plaintiff's misappropriation of trade secrets claim must be dismissed because she failed to sufficiently allege that EMC acquired a trade secret in bad faith or by improper means.  *Id.* at 14-19; Dkt. No. 51 ("EMC Reply") at 9-10.  Finally, EMC contends that Plaintiff failed to allege a sufficient connection between the Estate and EMC to support an unjust enrichment claim.  EMC Mot. at 19-21.[6]

In her motion, Ms. Scalabrini, proceeding *pro se*, argues that she cannot be held liable for converting Aitken's shares of EMC because she acquired those shares through a valid court order; namely, the Divorce Decree.  *See* Dkt. No. 42 ("Scalabrini Mot.").

### III. Analysis

#### A. EMC's Motion to Dismiss

---

[6] EMC also argues that (1) Dr. Marks's Lumeloid and Quensor technologies are not the proper subjects of a conversion claim; (2) EMC never actually acquired the Quensor technology and thus could not have converted it; (3) Plaintiff did not plead the existence of a trade secret with the requisite degree of specificity; and (4) Plaintiff did not sufficiently plead that the alleged trade secret was, in fact, secret.  *See* EMC Mot. at 11-14, 24-25.  Because the Court agrees with EMC's arguments described in the text above, it declines to address EMC's other arguments.

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### 1. Conversion Claims

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995) (internal quotation marks omitted). To state a claim for conversion, a plaintiff must allege "(1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006) (internal quotation marks omitted). Additionally, "since an innocent purchaser of stolen goods is not a wrongdoer, she is not liable in conversion unless and until she refuses the true owner's demand for a return of the property." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996) (citing *Lawrence v. Meloni*, 558 N.Y.S.2d 360, 361 (4th Dep't 1990)); *see also Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 473, 496 (S.D.N.Y. 2010) ("[I]n a cause of action for conversion against a good faith purchaser of chattels, 'demand and refusal are substantive elements' of the claim.") (quoting *DeWeerth v. Baldinger*, 836 F.2d 103, 107 n. 3 (2d Cir. 1987)). "The reason for this rule is simply that one in lawful possession shall not have such

6

possession changed into an unlawful one until he be informed of the defect of his title and have an opportunity to deliver the property to the true owner." *Leveraged Leasing*, 87 F.3d at 49 (internal quotation marks omitted).

Here, Plaintiff alleges that EMC converted the Estate Property when it purchased that Property from Aitken. FAC ¶¶ 38, 43. As Plaintiff concedes, she has not alleged that the Estate demanded the return that Property. Plaintiff instead contends that no such demand was required because EMC was willfully blind regarding Aitken's lack of authority to sell the Estate Property, and thus was not an innocent purchaser. *See* Dkt. No. 47 ("Pl. Opp.") at 6-8.

The Court agrees with EMC, however, that Plaintiff has not sufficiently pled willful blindness. *See* EMC Mot. at 15-19. Willful blindness is a mental state that "surpasses recklessness and negligence." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71. Willful blindness involves "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2070.

EMC's purported willful blindness in this case—and purported wrongdoing more generally—is premised solely on Plaintiff's allegations that (1) because EMC knew that Aitken was not biologically related to Dr. Marks and that Dr. Marks's will left nothing to his kin, EMC was required to "conduct commercially reasonable due diligence into Aitken's purported authority to transact with respect to the Estate Property"; and (2) such an inquiry would have revealed that Aitken had not been appointed as Executor of the Estate and that Dr. Marks's will had not been probated. *See* FAC ¶¶ 39-42; *see also id.* ¶ 5 ("Whether a will has been admitted to probate in Massachusetts, or an executor or personal representative appointed, is easily obtainable public

7

information."). These allegations do not indicate that EMC was willfully blind.[7] The allegation that EMC knew that Aitken was not biologically related to Dr. Marks and that Dr. Marks's will left nothing to his kin does not support the proposed inference that EMC must, therefore, have believed that it was highly probable that Aitken lacked the authority to sell the Estate Property. It is not uncommon for a will to bequeath assets to persons not biologically related to the testator or to bequeath no assets to biological kin, and thus the mere lack of a biological relationship between Aitken and Dr. Marks does not establish that EMC acted with willful blindness. The allegation is particularly inadequate to establish willful blindness given Aitken's explicit warranty in the TPA that he "exclusively own[ed] all right, title and interest in and to the [Estate Property] . . . free and clear of all liens, security interests or any other encumbrances."[8] TPA ¶ 4.2(b).

More generally, Plaintiff's assertion of wrongdoing against EMC is premised on the dubious proposition that, in an arms-length transaction involving the sale of a decedent's property, the buyer's knowledge that the seller is not biologically related to the decedent and that the decedent's will leaves no property to his kin gives rise to a duty on behalf of the buyer to verify that the will has been probated. This proposition is especially far-fetched where, as here, the seller is acting in his individual capacity, rather than as a purported representative of the decedent's estate, and the seller has explicitly warranted that he is the outright owner of the decedent's property. Not surprisingly, Plaintiff fails to identify any authority to support this proposition in his opposition papers.

Alternatively, Plaintiff asserts that EMC was not an innocent purchaser because she "alleged, based on the likelihood that EMC conducted basic due diligence and was aware that the will had not been probated, that EMC in fact knew that Aitken had no right to provide it with the property." Pl.

---

[7] Relatedly, Plaintiff does not explain how the concept of "commercially reasonable due diligence" is relevant to either conversion or willful blindness under New York law.

[8] While the Court has generously declined to consider the content of Dr. Marks's invalidated will in deciding EMC's motion, it is nonetheless worth noting that the will explicitly stated that Dr. Marks had "raised [Aitken] since childhood" and that Aitken was "acknowledged by [Dr. Marks] as [his] son." Dkt. No. 36, Ex. A at 1.

Opp. at 7. But Plaintiff's allegation as to EMC's actual knowledge has even less factual support than her allegation of willful blindness. *See Anonymous v. Simon*, No. 13 CIV. 2927 RWS, 2014 WL 819122, at *4 (S.D.N.Y. Mar. 3, 2014) (indicating that, in ruling on a motion to dismiss, courts are not required to credit "mere conclusory statements" as to a defendant's knowledge). Indeed, as EMC notes in its motion, Plaintiff has pled no facts whatsoever suggesting that EMC actually knew that Aitken lacked the authority to sell the Estate Property. Rather, Plaintiff alleged only that EMC was "on notice of the need" to inquire regarding Aitken's purported authority, and not that EMC actually conducted such an inquiry. *See* FAC ¶ 41. Accordingly, Plaintiff has not sufficiently pled that EMC was anything other than an innocent purchaser of the Estate Property, and the Estate's admitted failure to demand the return of that Property is fatal to its conversion claim.[9] EMC's motion to dismiss Plaintiff's conversion claim is thus granted.

### 2. Misappropriation of Trade Secret Claim

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."[10] *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (internal quotation marks omitted). Courts have likened "discovery by improper means" to "industrial espionage." *Watts v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 280 (E.D.N.Y. 2009); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 487 (1974) (using burglary, wire-tapping, and bribery as examples of methods by which trade secrets may be misappropriated).

---

[9] EMC's motion papers suggest that this defect is not curable, as EMC represents that it has "voluntarily returned all Assets of which it took possession from Aitken." EMC Mot. at 23 n.18.

[10] The parties dispute whether bad faith is also an element of a misappropriation of trade secrets claim under New York law. The Court is not required to resolve this dispute, since Plaintiff has not sufficiently pled discovery by improper means for the reasons stated above.

Here, Plaintiff has not attempted to allege the use of a trade secret in breach of an agreement, confidential relationship, or duty, and the Court agrees with EMC that Plaintiff has not sufficiently alleged the discovery of a trade secret by "improper means."  *See* EMC Reply at 9-10.[11] For substantially the same reasons as those set forth above, Plaintiff has not pled sufficient facts to support a conclusion that EMC's purchase through the TPA of the alleged trade secret—"[t]he information contained in Dr. Marks's laboratory notebooks relating to [his] continuing efforts and research with respect to [Lumeloid and Quensor] technology," FAC ¶ 45—occurred under circumstances amounting to "industrial espionage" or similar misconduct.  Accordingly, EMC's motion to dismiss Plaintiff's trade secret misappropriation claim is granted.

### 3.  **Unjust Enrichment Claim**

"[T]he theory of unjust enrichment . . . contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (internal quotation marks omitted).  "An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Id.* (internal quotation marks omitted).  "Thus, in order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Id.* (internal quotation marks omitted).  "It is well established that unjust enrichment does not require proof of any wrongdoing by the enriched party." *United States v. Nagelberg*, 772 F. Supp. 120, 122 (E.D.N.Y. 1991) (citing *Ptachewich v. Ptachewich*, 465 N.Y.S.2d 277, 278-79 (2d Dep't 1983)).

---

[11] The Court exercises its discretion to consider this argument, which EMC raised for the first time in its reply brief.  *See Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-CV-3940 DLI RML, 2015 WL 1443038, at *7 (E.D.N.Y. Mar. 27, 2015) ("A district court enjoys broad discretion . . . to consider arguments made for the first time in a reply brief." (internal quotation marks omitted)).  In any event, this argument is substantially similar to the argument raised in EMC's principal brief that Plaintiff failed to sufficiently allege bad faith.  *See* EMC Mot. at 15-19.

10

The New York Court of Appeals has recently reiterated that, "while 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'" *Georgia Malone*, 19 N.Y.3d at 516 (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007)).  Although the nature of the relationship required to establish an unjust enrichment claim has not been clearly defined, the relationship is "too attenuated" if the parties were not connected in a manner that "could have caused reliance or inducement," *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011), or if they "simply had no dealings with each other," *Georgia Malone*, 19 N.Y.3d at 517-18; *accord In re Motel 6 Sec. Litig.*, No. 93 CIV. 2183 (JFK), 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997) ("The requirements [of unjust enrichment] clearly contemplate that a defendant and plaintiff must have had some type of direct dealings or an actual, substantive relationship."); *Jet Star Enterprises, Ltd. v. Soros*, No. 05 CIV. 6585 (HB), 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006) ("To succeed on a claim for unjust enrichment, . . . plaintiff must have had direct dealings or some sort of quasi-contractual relationship with each defendant.").  This requirement stems from "the context in which [unjust enrichment claims] must be viewed: as an alternative to contract, where a contractual relationship has legally failed." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2d Cir. 1997) ("[U]nder the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract to prevent one person who has obtained a benefit from another . . . from unjustly enriching himself at the other party's expense." (internal quotation marks omitted)).

Here, as EMC argues, Plaintiff has not alleged a sufficient connection between the Estate and EMC to support an unjust enrichment claim.  *See* EMC Mot. at 19-21.  As noted, EMC contracted to purchase the Estate Property with Aitken in his personal capacity, rather than in his capacity as a purported representative of the Estate, and Aitken explicitly warranted that he was the sole owner of that Property.  *See* TPA.  Although EMC was allegedly formed in order to develop Dr.

11

Marks's technologies, *see* FAC ¶¶ 10-11, Plaintiff has not alleged that EMC and the Estate had any dealings with each other or any sort of actual relationship relevant to EMC's acquisition of the Estate Property through the TPA. Under these circumstances, the authority described above compels the conclusion that Plaintiff cannot maintain an unjust enrichment claim against EMC.

In response to EMC's argument, Plaintiff contends that she pled a sufficient connection between the parties merely by alleging that "EMC knew, or in the exercise of commercially reasonable due diligence should have known, that the property it was 'purchasing' belonged to the Estate, not Aitken." Pl. Opp. at 10 (citing FAC ¶¶ 38-40). But even accepting the premise of this argument—that the requisite relationship between the parties can be established solely by EMC's knowledge or constructive knowledge that the Estate owned the purchased property—Plaintiff has not sufficiently pled such knowledge or constructive knowledge for the reasons already indicated.

The New York Court of Appeals' decision in *Georgia Malone & Co. v. Rieder* strongly supports the above analysis. There, plaintiff Georgia Malone & Company, Inc. ("Malone"), a real estate brokerage firm, alleged that it provided developer CenterRock Realty, LLC ("CenterRock") with due diligence reports in connection with a potential property purchase. *Georgia Malone*, 19 N.Y.3d at 514. Thereafter, without providing due compensation to Malone, CenterRock allegedly entered into an agreement with Rosewood Realty Group, Inc. ("Rosewood") pursuant to which CenterRock sold the due diligence reports prepared by Malone to Rosewood for $150,000. *Id.* at 515. After Rosewood sold the property addressed those reports, Malone sued both CenterRock and Rosewood for unjust enrichment. *Id.* The trial court dismissed Malone's unjust enrichment claim against Rosewood, but not CenterRock. *Id.*

The New York Court of Appeals upheld the trial court's decision, finding that "the relationship between Malone and Rosewood [was] too attenuated" to support an unjust enrichment claim because those two parties "simply had no dealings with each other." *Id.* at 517-18. The Court rejected Malone's argument that "its unjust enrichment claim should be allowed to proceed because

Rosewood was aware that Malone had created the due diligence reports and Rosewood had used the materials for its own benefit without compensating Malone." *Id.* at 517. According to the Court, "mere knowledge that another entity created the documents is insufficient to support a claim for unjust enrichment." *Id.* The Court emphasized that "there is no claim that Rosewood had anything other than arm's length business interactions with CenterRock" in connection with the sale of the due diligence reports, and that "[t]he pleadings do not implicate Rosewood in [CenterRock's] alleged wrongdoing." *Id.* at 518; *see also id.* at 519 ("[B]ecause the complaint fails to allege that Rosewood was aware of the wrongfulness of CenterRock's actions, Rosewood appears to fit the criteria of a good-faith purchaser for value[,] which . . . would not support an unjust enrichment claim."). The Court concluded as follows:

> The rule urged by Malone would require parties to probe the underlying relationships between the businesses with whom they contract and other entities tangentially involved but with whom they have no direct connection. This would impose a burdensome obligation in commercial transactions. Although Malone's alleged loss of compensation for preparation of the due diligence reports certainly appears unfair, its unjust enrichment claim against Rosewood falls short of stating facts establishing a sufficient relationship to impose potential liability against that party. Such claims may be more properly pursued against CenterRock . . . and, since those claims remain pending, Malone is not without recourse.

*Id.* at 519.

The facts at issue in *Georgia Malone* are analogous to the facts at issue here in several relevant respects. Just as Malone alleged that CenterRock wrongfully sold Malone's work product (the due diligence reports) to Rosewood, the Estate alleges that Aitken wrongfully sold the Estate's property to EMC. And just as Malone failed to sufficiently allege that Rosewood was anything other than an innocent purchaser engaging in an arms-length transaction with CenterRock, the Estate fails to sufficiently allege that EMC was anything other than an innocent purchaser engaging in an arms-length transaction with Aitken. Thus, given that the Estate and EMC "simply had no dealings with each other," *id.* at 517-18, *Georgia Malone* dictates that the Estate's unjust enrichment claim against

13

EMC "falls short of stating facts establishing a sufficient relationship to impose potential liability against that party," *id.* at 519.

As noted, in arguing to the contrary, the Estate relies on EMC's alleged knowledge or constructive knowledge that the Estate owned the purchased property. In *Georgia Malone*, however, the Court rejected a substantially similar argument premised on Rosewood's alleged knowledge that Malone had created the purchased reports. *See id.* at 517. The rule urged by the Estate "would require parties to probe the underlying relationships between the businesses [or persons] with whom they contract and other entities tangentially involved but with whom they have no direct connection," thereby imposing "a burdensome obligation in commercial transactions." *Id.* at 519. Accordingly, under the New York Court of Appeals' decision in *Georgia Malone*, the Estate fails to sufficiently allege an unjust enrichment claim against EMC, and EMC's motion to dismiss that claim is granted. Although the Estate normally would not be without recourse in light of its potential claims against Aitken, *see id.*, (referring to Malone's pending claim against CenterRock), the Estate has elected not to bring any claims against Aitken in this action for unexplained reasons.

      **B.**      **Ms. Scalabrini's Motion for Judgment on the Pleadings**

In deciding a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the Court employs the same standards as those applicable to a motion to dismiss under Rule 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). Those standards, as well as the standards applicable to conversion claims under New York law, are set forth above.

Plaintiff alleges that Ms. Scalabrini has possession of at least some of the shares of EMC that Aitken obtained through the TPA (hereinafter, the "EMC Shares"), that the Estate has a superior right to possess those Shares, and that Ms. Scalabrini refused the Estate's demand that she return them. *See* FAC ¶¶ 34-36. As a result, while it is undisputed that Ms. Scalabrini is an innocent transferee, Plaintiff has sufficiently alleged a conversion claim against Ms. Scalabrini. *See Command Cinema*, 464 F. Supp. 2d at 199; *Leveraged Leasing*, 87 F.3d at 49.

In arguing to the contrary, Ms. Scalabrini relies on the principle that, in general, "[o]ne is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order which is valid or fair on its face." *Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir. 1989) (quoting Restatement (Second) of Torts § 266 (1965)); *accord Weisman, Celler, Spett & Modlin v. Fein*, 639 N.Y.S.2d 805, 805 (1st Dep't 1996) (dismissing conversion claim because the defendant acted pursuant to court order directing the sale of property). Ms. Scalabrini specifically argues that she cannot be held liable for converting the EMC Shares because those Shares were transferred to her pursuant to a valid court order: the Divorce Decree. *See* Scalabrini Mot. In response, Plaintiff contends that Ms. Scalabrini obtained the EMC Shares by agreement pursuant to the 2012 MSA, and not by court order pursuant to the 2013 Divorce Decree. *See* Dkt. No. 49.

Plaintiff's argument is misplaced. Because it is undisputed that Ms. Scalabrini is an innocent transferee, the alleged conversion at issue did not occur until she refused the Estate's demand that she return the EMC Shares in December 2014. *See Leveraged Leasing*, 87 F.3d at 49. The relevant question is thus whether Ms. Scalabrini was acting pursuant to the Divorce Decree when she refused the Estate's demand, and not whether she was acting pursuant to the Divorce Decree when she initially took possession of the Shares. Whether the shares were initially transferred to Ms. Scalabrini pursuant to the MSA or the Divorce Decree is immaterial.

Nonetheless, while Ms. Scalabrini's argument is far from frivolous, it ultimately does not withstand scrutiny for two reasons. First, Plaintiff has essentially alleged in the amended complaint that Aitken misappropriated the EMC Shares and thus did not have a valid ownership interest in them, and the Court cannot conclude that the Divorce Decree granted Ms. Scalabrini a greater ownership interest in the Shares than that of Aitken's. As a general matter, in the related context of the distribution of encumbered property incident to divorce, "[t]he court in a divorce action has no power to disturb the rights which creditors lawfully have against the parties to such action or to

15

award the parties' property to the creditors' prejudice." 27B C.J.S. Divorce § 878. By inference, the Estate's alleged ownership interest in the EMC Shares would have survived the transfer of those Shares to Ms. Scalabrini effected by the Divorce Decree.

Second, even assuming, *arguendo*, that Ms. Scalabrini received an ownership interest in the EMC Shares incident to her divorce, the Divorce Decree contains no explicit directives that would categorically authorize her to refuse to convey those Shares to other parties. *Cf. Okyere v. Palisades Collection, LLC*, 961 F.Supp.2d 522, 534 (S.D.N.Y. 2013) (denying motion to dismiss a conversion claim and noting that, "even if the initial taking of the money was authorized, the complaint alleges that the [defendants] deliberately refused for many months to comply with a written demand to return the money . . . ."); *Bray v. Planned Parenthood Columbia Willamette, Inc.*, No. 2:10-CV-054, 2010 WL 3666978, at *5 (S.D. Ohio Sept. 14, 2010) ("[E]ven assuming that the goods were legally seized, [the defendants] have cited no authority to suggest that the tort of conversion could not have occurred after the [seizure] order was issued."). The Divorce Decree simply does not address what Ms. Scalabrini may or may not do with the EMC Shares in the future, including whether she may refuse to convey those Shares to a party asserting a superior ownership interest. Ms. Scalabrini thus has not established that the Divorce Decree insulates her from liability for conversion in this case, and her motion for judgment on the pleadings is denied.

## IV.    Conclusion

For the foregoing reasons, EMC's motion to dismiss is granted in its entirety and Ms. Scalabrini's motion for judgment on the pleadings is denied. As to whether Plaintiff's claims against EMC should be dismissed with or without prejudice, because Plaintiff has appeared through counsel and has not requested leave to file a second amended complaint, declining to grant such leave is within the Court's discretion. *See Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 102 (E.D.N.Y. 2004) ("[A] district court has no duty to instruct plaintiffs that they may move to amend their complaint and, at least in counseled cases, cannot abuse its discretion by failing to *sua sponte* grant

16

leave to amend." (internal quotation marks omitted)); *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999) ("[T]he district court was not obliged to grant plaintiffs leave to amend their complaint.  While we recognize that leave to amend should be freely granted, . . . we will not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought." (internal quotation marks omitted)).  Moreover, Plaintiff has already amended her complaint once in response to a motion to dismiss that was substantially similar to instant motion, *see* Dkt. No. 20, which suggests that granting a further opportunity to amend would be futile, *see Williams v. Williams*, No. 13-CV-3154 RA, 2015 WL 568842, at *8 (S.D.N.Y. Feb. 11, 2015) (declining to grant leave to amend where the plaintiff had already amended his complaint in response to the defendants' original motion to dismiss); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 544-45 (S.D.N.Y. 2001) (same).  Accordingly, the Court dismisses Plaintiff's claims against EMC with prejudice.  The Clerk of Court is instructed to terminate the motions pending at Dkt. Nos. 35 and 41, and to amend the official caption to reflect that this case is proceeding against Ms. Scalabrini only.

      SO ORDERED.

Dated: June 9, 2015  
New York, New York

_____  
GREGORY H. WOODS  
United States District Judge