UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
  BRIDGET MARKS, as personal representative of :
  THE ESTATE OF ALVIN M. MARKS,           :
                                            :
                        Plaintiff,     :
                                            :
                  -v -            :
                                            :
RACHEL SCALABRINI,               :
                                            :
                      Defendant.   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/02/2016

1:14-cv-8965-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

      Dr. Alvin M. Marks was a renowned scientist, who generated valuable intellectual property

over the course of his life.  He also had a complicated family life, which generated this litigation after

his death.  Prior to Dr. Marks's death, Mr. Gerard J. Aitken IV ("Aitken") served as Dr. Marks's

caregiver, and had a power of attorney to act on Dr. Marks's behalf.[1]  Following Dr. Marks's death,

Aitken personally transferred some of Dr. Marks's intellectual property to Energy Materials

Corporation ("EMC") in exchange for stock in that company.  The plaintiff, Dr. Marks's daughter,

acting as the personal representative of Dr. Marks's estate, claims that Aitken's transfer of Dr.

Marks's assets to EMC was invalid, and filed this suit to recover the intellectual property and the

EMC shares issued in consideration for the transfer.

      Since the case was filed, the plaintiff has decided not to pursue its claim against Aitken, who

transferred Dr. Marks's intellectual property.  The Court dismissed plaintiff's case against EMC.[2]

The remaining defendant, Ms. Rachel Scalabrini ("Scalabrini"), is Aitken's ex-wife.  She received her

shares in EMC from Aitken as part of her divorce settlement, and to satisfy a judgment against

---

[1] As explained further below, Aitken was originally named as a defendant in this case in New York state court, but was dismissed before EMC removed the case to federal court.

[2] EMC was dismissed from this action in June 2015.  Memorandum Order and Opinion, ECF No. 63.  The Estate has moved for the Court to reconsider its June 2015 decision and for leave to amend the complaint; that motion is currently pending before the Court.  Mot. for Reconsideration and Leave to Amend, ECF No. 126.

Aitken for unpaid child support.  Both parties have now filed cross-motions for summary judgment, each seeking a decision that declares them to be the rightful owner of the stock.  The parties do not dispute that, if the assets sold to EMC were owned by the estate of Dr. Marks at the time of his death, Aitken could not transfer them to EMC.  But Scalabrini asserts that the assets were transferred to Aitken prior to Dr. Marks's death, and that, as a result, they were not assets of Dr. Marks's estate and Aitken could legally transfer them to EMC.  If the intellectual property was lawfully transferred to EMC, the plaintiff would have no basis to recover Scalabrini's shares in EMC. Because there is a disputed issue of material fact regarding whether Dr. Marks still owned the intellectual property conveyed to EMC at the time of his death, each of the cross-motions for summary judgment is DENIED.

## I.    Background

### a.  *The Life and Work of Dr. Marks*

Dr. Marks was a prolific inventor, who focused particularly on the field of solar energy.  He held multiple patents, two of which are relevant to this litigation—Patent 5,229,624 (the "Lumeloid Patent"), and Patent 6,501,093 (the "Quensor Patent").  Pl.'s Ex. 14, ECF No. 100-14; Pl.'s Ex. 3, ECF No. 100-3.  Lumeloid is a technology designed to generate solar energy through the use of rectennas and thin-film polymers.  Pl.'s Ex. 14.  Quensor is an energy storage technology.  Pl.'s Ex. 3.  In the last decade of his life, Dr. Marks focused his work on the Lumeloid and Quensor technologies.  56.1 Stmt. ¶ 45, ECF No. 123.  He maintained a lab where he kept his research equipment and extensive notebooks describing his research.  Marks Decl. ¶ 3, ECF No. 99.

Dr. Marks's work is the object of this law suit, but the dispute is driven by elements of Dr. Marks's personal life.  Dr. Marks was married to Molly Bennett Aitken Strouse between 1967 and 1978.  Def.'s Ex. 22, Aitken Aff. ¶ 3, ECF No. 125-2 at 10.  Ms. Strouse gave birth to four children during the course of her marriage to Dr. Marks, including Bridget Marks ("Ms. Marks"), who is now serving as the personal representative of Dr. Marks's estate.  *Id.* ¶ 2.  Ms. Strouse's other three

children—Jackie Marks, Sean Marks, and Fred Marks—and are not Dr. Marks's biological children; they are the fruit of Ms. Strouse's extramarital affairs. *Id.* After her marriage to Dr. Marks ended, Ms. Strouse married Gerard J. Aitken, III. *Id.* ¶ 3. Aitken—the defendant's ex-husband—is the biological son of Ms. Strouse and Mr. Gerard Aitken III. After her husband passed away, Ms. Strouse lost custody of her son due to neglect and abuse. *Id.* ¶¶ 3-5. Dr. Marks took in the fatherless child, and Aitken considered Dr. Marks to be his father. *Id.* ¶¶ 3-8.

As Dr. Marks aged, Aitken began to assume responsibility for his care. By May 2003, Aitken had become Dr. Marks's primary caregiver. Aitken Aff. ¶ 8. At that time, Dr. Marks's mind remained sharp but his deteriorating physical health left him unable to care for himself. *Id.* Fred Marks lived with Dr. Marks, but he was unable provide the care Dr. Marks required during the week. As a result, Aitken took care of Dr. Marks during the week, while Fred Marks took care of him on the weekends. *Id.* ¶¶ 9-10. As Dr. Marks's caregiver, Aitken attended to his daily needs—cooking, cleaning, dressing, and showering, among other tasks. *Id.* ¶¶ 12-13. Aitken also worked with Dr. Marks on his inventions. *Id.*

On February 16, 2005, Dr. Marks executed a durable power of attorney and his will. Pl.'s Ex. 11, ECF No. 100-11 (the "Power of Attorney" or "POA"); Pl.'s Ex. 13, ECF No. 100-13 (the "2005 Will"). The Power of Attorney gave Aitken broad authority to act on Dr. Marks's behalf. In particular, it authorized him

> [t]o make gifts to my spouse, children, grandchildren, great grandchildren, and other family members on special occasions, including birthdays and seasonal holidays, including cash gifts, and to such other persons with whom I have an established pattern of giving (or if it is appropriate to make such gifts for estate planning and/or tax purposes), in such amounts as my Attorney-in-fact may decide in his or her absolute discretion, having regard to all of the circumstances, including the gifts I made while I was capable of managing my own estate, the size of my estate and my income requirements.

POA ¶ 10(m). Moreover, Aitken, as Dr. Marks's attorney-in-fact, was "allowed to personally gain from any transaction" that he made on Dr. Marks's behalf, so long as the transaction was completed

3

in good faith and in Dr. Marks's best interest. *Id.* ¶ 13. In addition to specifically delineated powers,
Aitken was authorized to "do any act or thing that [Dr. Marks] could do in [his] own proper person
if personally present." *Id.* ¶ 10(q).

The 2005 Will bequeathed to Aitken all of Dr. Marks's property, including his company,
Advanced Research Development Inc., and all "computers, files, paperwork, books, patents, data,
Lumeloid stretching machine and all monies," "so that [Aitken] may continue my [Dr. Marks's] work
related to the Lumeloid and Quensor patents." 2005 Will at 1-2. The 2005 Will named Aitken
executor of Dr. Marks's estate.

By late 2005, Dr. Marks was suffering from dementia and had become "confused and
paranoid." Aitken Aff. ¶ 22. In the summer of 2006, Dr. Marks decided that his laboratory should
be closed down. Scalabrini Aff. at 2, ECF No. 125; *see also* Def.'s Ex. 5, March 31, 2010 email from
Aitken to S. Deluca, ECF No. 125-1 at 27 (referencing closure of the lab in 2006). Aitken shut
down the lab and disposed of the contents—computers and electronic equipment were given to
Robert Horn, an engineer who worked with Dr. Marks on the Lumeloid technology; some items
that belonged to Dr. Marks's brother were given to his brother's daughters, some items were thrown
away; and Aitken placed other materials, including Dr. Marks's notebooks, in a storage unit.
Scalabrini Aff. at 2; Def.'s Ex. 2, Horn Aff., ECF 125-1 at 20.

Scalabrini traveled to Massachusetts in order to help her then-husband, Aitken, clean out and
close down the lab. Scalabrini Aff. at 1-2. Aitken told Scalabrini that Dr. Marks wanted him "to
keep this stuff but there is a lot of junk." *Id.* at 2. The process of shutting down the lab evidently
took several months, as an invoice addressed to Aitken from Horn reflects that Horn went to the
lab and removed various computers and other electronic equipment from the lab in November
2006. Def.'s Ex. 6, Horn Invoice, ECF No. 125-1 at 30.

On May 16, 2007, Dr. Marks was found to be incapable of taking care of himself due to his
diminished capacity, and Aitken was appointed Dr. Marks's permanent guardian. Def.'s Ex. 21,

4

Notice of Guardianship Hr'g, ECF No. 125-2 at 2; Pl.'s Ex. 10, Permanent Decree of Guardianship, ECF No. 100-10.

In early 2008, Dr. Marks was admitted into Wachusett Manor nursing home in Garner, Massachusetts.  Def.'s Ex. 27, ECF 125-2 at 70.  He died on May 25, 2008.  Pl.'s Ex. 9, Death Certificate of Alvin M. Marks, ECF No. 100-9.  Although the Lumeloid patent had expired prior to Dr. Marks's death, 56.1 Stmt. ¶ 2, the Quensor patent was still in effect when he passed away.  Aitken Aff. ¶ 48.

### b.  Agreements Regarding Dr. Marks's Intellectual Property

During Dr. Marks's life and after his death various members of the Marks-Aitken family attempted to exercise control over, or assert ownership of, Dr. Marks's inventions.  The earliest agreement regarding Dr. Marks's work was signed in 1983.  Five years after their divorce, Dr. Marks and Ms. Strouse signed an agreement that purportedly required Ms. Strouse's approval of "[a]ny new agreements between Alvin Melville Marks and third parties" if such agreements related to the "Patent Rights and Royalties derived" from the patents owned by Dr. Marks.  Pl.'s Ex. 5, ECF No. 100-5 (the "1983 Agreement").  The agreement was made "[i]n view of [the parties] mutual family interests."  *Id.*

Disagreements regarding Dr. Marks's work between his family members percolated toward the end of his life and boiled over after his death.  In April of 2006, according to Aitken, Ms. Strouse and Ms. Marks "attempted to interfere" with Aitken's negotiations regarding Dr. Marks's work.  Aitken Aff. ¶ 45(b).  On April 24, 2006, Aitken emailed Ms. Marks regarding his authority to conduct Dr. Marks's business affairs.  Pl.'s Ex. 16, ECF 100-16.  In his email, Aitken explained that "the family does not have the authority to make deals or stop Dad from making deals.  We are only entitled to benefit from what Dad makes in income from his technology."  *Id.*  Aitken reminded Ms. Marks that he had "complete authority to handle all of [Dr. Marks's] business affairs" under the Power of Attorney, and said that he would "continue to work towards making a deal that will benefit

the entire family." *Id.*  There is no evidence before the Court that any deal was ever consummated as a result of the negotiations referenced in Aitken's April 2006 email.

However, in April 2009, after Dr. Marks's death, Aitken signed an agreement with six other members of the Marks-Aitken family regarding "development of certain technologies created or improved by Alvin Marks, deceased, relating to Lumeloid and Quensor (the 'Technologies')."  Def.'s Ex. 8, ECF No. 125-1 at 33 (the "2009 Agreement").  Specifically, the 2009 Agreement stated that Aitken owned the Technologies—as defined in that agreement—but that he would pay a certain percentage of the proceeds arising from any buy-out or commercialization of the Technologies to his mother and five of his siblings.  *Id.*  At the time that the 2009 Agreement was executed, the 2005 Will bequeathing Aitken all of Dr. Marks's assets and appointing him executor of the estate had not been through probate, and remained unchallenged.  No personal representative of Dr. Marks's estate had been appointed in April of 2009, and the estate itself is not a party to the 2009 Agreement.  56.1 Stmt. ¶¶ 39-40; 2009 Agreement.  However, the plaintiff, Ms. Bridget Marks, signed the 2009 Agreement in her personal capacity, together with her siblings.

### c.  Aitken's Transactions with EMC

In the fall of 2009, Dr. Stephen Deluca ("Deluca") reached out to Aitken to set up a meeting and discuss Dr. Marks's technology.  56.1 Stmt. ¶¶ 61-62.  Deluca had conducted technical diligence on Dr. Marks's work, and thought that it had great potential.  Pl.'s Ex. 15, Deluca Dep. 42:21-43:13.  Aitken and Deluca began to discuss the possibility of setting up a company to develop and commercialize Dr. Marks's technology.  56.1 Stmt. ¶ 64.  At some point late in 2009 or very early in 2010, EMC was founded as the corporate vehicle to implement those plans.  *Id.* ¶ 58.

On January 12, 2010, Aitken entered into a Technology Purchase Agreement (the "TPA") with EMC.  In that agreement, Aitken agreed to sell EMC intellectual property related to Lumeloid and Quensor including "all tangible embodiments thereof in all forms and medias, including all existing hard copy and electronic copy forms" (the "Intellectual Property") in exchange for

2,500,000 shares of EMC stock.  Pl.'s Ex. 4, ECF No. 100-4 §§ 2.6, 3.1.  Intellectual Property that was "solely related to the Quensor application," however, was excluded from the sale; the TPA only gave EMC an option to buy Quensor-related Intellectual Property in the future.  *Id.* §§ 2.1, 2.3.  The TPA included a representation and warranty by Aitken that he "exclusively owns all right, title and interest in and to the Alternative Energy IP . . . free and clear of all liens, security interests or any other encumbrances."  *Id.* § 4.2(b).

In his discussions with Deluca leading up to the TPA, Aitken represented that he owned the Intellectual Property.  Aitken told EMC he "was willed the stuff from Alvin Marks," Deluca Dep. 105:5-10, and when the deal was being finalized, EMC requested, and received, a copy of the 2005 Will.  *Id.* at 103:18-20.  But Aitken's did not identify the 2005 Will as the sole basis for his ownership of the Intellectual Property.  *Id.* at 102:23-103:5.  Aitken told Deluca "that Alvin gave him the stuff." *Id.* at 106:3-20.  Aitken would also say "that the stuff [was] his, he own[ed] it, and it was an understanding between them [Aitken and Dr. Marks.]"  *Id.*  "Sometimes [Aitken] would talk about the will but other times he didn't talk about the will."  *Id.*  According to Deluca, "there wasn't one thing," that formed the basis for his belief that Aitken owned the Intellectual Property, "[i]t was a lot of things."  *Id.* 97:19-22.  Eventually, however, a potential investor in EMC raised concerns about the basis for Aitken's ownership of Dr. Marks's assets.  To respond to those concerns, EMC asked that the 2005 Will be probated.  *Id.* 121:12-25.

### d.  *Probate Proceedings Invalidate the 2005 Will*

In April 2011, Aitken filed a petition to probate Dr. Marks's will and to appoint himself executor of Dr. Marks's estate.  Pl's Ex. 6, ECF No. 100-6, *In the Matter of Alvin M. Marks,* Worcester County Probate and Family Court, Case No. WO07P0197EP1, 4/4/2011 Dkt. Entry.  Ms. Marks challenged the validity of both the will and Aitken's petition.  *Id.* at 8/15/2011 Dkt. Entry.  In January 2013, the Massachusetts probate court denied Aitken's motion for summary judgment seeking to admit the 2005 Will to probate.  56.1 Statement ¶ 36; Pl.'s Ex. 6 1/15/2013 Dkt. Entry.

The probate court determined that there was a significant question as to whether Aitken exercised improper influence over Dr. Marks in drafting his will.[3]  In October 2013, the probate court dismissed Aitken's probate application.  56.1 Stmt. ¶ 38; Pl.'s Ex. 6 10/18/2013 Dkt. Entry.

Ms. Marks then filed a petition for formal probate of the 2005 Will; she was appointed personal representative of the estate in February 2014.  Pl.'s Ex. 7, ECF No. 100-7, *In the matter of Alvin M. Marks*, Case No. WO13P4059EA, 12/30/2013 and 3/3/2014 Dkt. Entries.  The 2005 Will passing title to Dr. Marks's assets exclusively to Aitken having been ruled invalid, Dr. Marks's estate is proceeding in intestacy.  56.1 Stmt. ¶ 41; Pl.'s Ex. 8, ECF No. 100-8, Order Appointing Marks Personal Representative.

In connection with the probate proceedings, Aitken submitted a sworn affidavit averring that, when Dr. Marks died, his estate consisted solely of his personal belongings, $49.25 in his bank account, and the Quensor patent.  Aitken Aff. ¶ 48.  In the same affidavit, Aitken stated that his shares of EMC were "not even part of Alvin's estate," but Aitken's "personal property in a private company formed in 2010 and based upon work that has been in the public patent domain since 2001."  *Id.* at ¶ 49.

### e.   *Aitken's Divorce and Transfer of the EMC Stock*

Scalabrini is Aitken's ex-wife.  56.1 Stmt. ¶ 5.  Scalabrini and Aitken were divorced on January 11, 2012.  Under their marital separation agreement, she was awarded half of his shares in EMC.  Pl.'s Ex. 22, ECF No. 100-22.  As the result of a reverse stock split and several sales of stock, by March 30, 2013, when Ms. Scalabrini contacted EMC regarding the transfer of stock to her from Aitken, Aitken held only 285,660 shares.  Def.'s Ex. 13 ¶ 8.  In accordance with the terms of a first refusal agreement that restricted transfers of EMC stock, other stockholders were offered the

---

[3] The Probate Court's summary judgment decision has not been provided by the parties and is not available to the Court on electronic databases.  The parties, however, have not disputed the characterization of that decision described in this opinion, which was derived from EMC's motion papers supporting its Motion to Dismiss, ECF No. 37, and which is offered solely for the sake of context.

opportunity to purchase Aitken's stock prior to the transfer.  *Id.*  One stockholder exercised his right and purchased 25,000 shares.  By September of 2013, Aitken had transferred a total of 152,830 shares to Ms. Scalabrini, leaving him with 107,830 shares.  *Id.* at ¶ 9.

On March 28, 2014, Scalabrini obtained a judgment against Aitken for failure to pay child support.  Pl.'s Ex. 23, ECF No. 100-23.  On June 9, 2014 she accepted Aitken's remaining shares of EMC stock as satisfaction for that judgment.  Pl.'s Ex. 24, ECF No. 100-24.

## II.      Procedural History

In May 2014, the plaintiff sued EMC, Aitken, and Deluca, among others, in New York state court seeking monetary damages, a declaratory judgment that the estate is the true owner of the intellectual property at issue, and imposition of a constructive trust.  Notice of Removal Ex. C, ECF No. 2-3.  The plaintiff later dismissed the action as to Aitken and Deluca.  *See* Notice of Removal Ex. C, ECF No. 2-3 at 17, 25, and 28.  EMC was served in October 2014 and removed the case to federal court in November 2014.  *See* Notice of Removal, ECF No. 2.

On January 8, 2015, the plaintiff filed an amended complaint.  ECF No. 24.  The amended complaint added Scalabrini as a defendant.  Plaintiff demands that Scalabrini give it her shares in EMC that she received in her divorce settlement and for back child support, claiming that she is liable for conversion of the estates' property.  On June 9, 2015, the Court dismissed the plaintiff's claims against EMC; the plaintiff's motion for reconsideration of that decision and for leave to further amend its complaint is currently pending.  *See* ECF Nos. 63 and 126.

Scalabrini moved for summary judgment, arguing that Dr. Marks had given the Intellectual Property to Aitken while he was still alive, and, that, therefore, the Intellectual Property was never part of Dr. Marks's estate.  ECF No. 92.[4]  The plaintiff cross-moved for summary judgment, arguing

---

[4] To the extent that Scalabrini relies on cases concerning the doctrine of ademption, or ademption by extinction, such reliance is misplaced.  "The doctrine of ademption 'seeks to give effect to a testator's probable intent by presuming he intended to extinguish a specific gift of property when he disposed of that property prior to his death.'"  *Kelley v. Neilson*,

that the only admissible evidence establishes that Aitken's claim of ownership was based on the 2005 Will, and that, with the invalidation of the 2005 Will, it is clear that the Intellectual Property is property of Dr. Marks's estate.  ECF No. 97.

### III.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that it is entitled to summary judgment.  *See id.* at 256.

In evaluating a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).  The Court's job is not to "weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party."  *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citing *Anderson*, 477 U.S. at 249).  "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

---

433 Mass. 706, 711 (2001) (quoting *Wasserman v. Cohen*, 414 Mass. 172, 174 (1993)).  Here, Dr. Marks's estate is proceeding in intestacy.  Therefore, the doctrine of ademption is not applicable.

The same standard applies to cross-motions for summary judgment.  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Because she is proceeding *pro se*, the Court liberally construes Ms. Scalabrini's submissions and interprets them "to raise the strongest arguments that they *suggest*."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original) (citation omitted); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . .") (citation omitted).  "Proceeding pro se, however, does not relieve a party from the formalities of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."  *Showers v. Eastmond*, No. 00-cv-3725-SAS, 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001) (internal citation and citation omitted).

## IV.   Discussion

It is undisputed that property owned by Dr. Marks at the time of his death immediately became property of his estate, and that under Massachusetts law none of the heirs to the estate have any ownership interest in estate property until it is distributed.  *T&S Wholesale, Inc. v. Kavlakian*, 1998 Mass. App. Div. 99, 1998 WL 247263, at *3 (Mass. App. Ct. 1998) (citing *Stuck v. Schumm*, 290 Mass. 159, 163 (1935); *Lowell v. Hudson*, 268 Mass. 574, 577 (1929); *Rolfe v. Atkinson*, 259 Mass. 76, 78 (1927)).  If Dr. Marks owned the Intellectual Property at the time of his death, the parties agree, it would be an asset of the estate—an asset that Aitken would have no authority to transfer to EMC.  So the question is whether there is a disputed issue of fact regarding Dr. Marks's ownership of the Intellectual Property when he passed away.

Scalabrini points to evidence, including statements by Aitken, which support her position that the Intellectual Property had been gifted to Aitken prior to Dr. Marks's death.  In particular, Scalabrini argues that Aitken, acting as Dr. Marks's attorney-in-fact, gifted himself the Intellectual

Property when he closed down Dr. Marks's lab in 2006.  In its motion, the plaintiff points to statements and representations by Aitken in which he asserted that he had obtained title through the invalidated 2005 Will, as the basis for their position that title to the Intellectual Property had not been transferred prior to Dr. Marks's death.  Plaintiff posits that those statements conclusively prove that Aitken did not intend to gift himself the Intellectual Property prior to Dr. Marks's death.  The plaintiff also argues that Aitken did not have the authority to gift himself the Intellectual Property. The Court addresses the plaintiff's argument regarding limitations on Aitken's authority to transfer the Intellectual Property first.

### A.   Plaintiff's Arguments Regarding Legal Limits on Aitken's Authority Do Not Support Summary Judgment in Favor of Plaintiff

The plaintiff argues that it is indisputable that Aitken did not own the Intellectual Property at Dr. Marks's death because he lacked legal authority to transfer the assets to himself.  The plaintiff's arguments rest on two foundations:  first, the assertion that Dr. Marks himself was unable to legally gift his intellectual property due to limitations on transfers imposed by the 1983 Agreement with Ms. Strouse; and second, the proposition that the Power of Attorney did not authorize Aitken to gift himself the property.  Pl.'s Br. 13-14, ECF No. 133.  Neither argument, however, is dispositive.

First, the Court observes that the parties' operating premise seems to be that the only means by which Aitken might have acquired an interest in the Intellectual Property prior to Dr. Marks's death was a gift to himself, taking advantage of the authority granted to him the Power of Attorney. The Court focuses its analysis on that premise.  However, the Court notes that the evidence might allow a jury to conclude reasonably that Dr. Marks gifted Aitken the property directly, rather than that Aitken gifted himself the property under the authority of the Power of Attorney.  The evidence shows that Dr. Marks shut down his lab in the summer of 2006.  Dr. Marks was not declared incompetent until a year later, so, while Aitken had legal authority to transact business on Dr. Marks's behalf pursuant to the Power of Attorney, the evidence does not support the conclusion

that Dr. Marks lacked capacity to act on his own behalf prior to 2007, precluding a direct gift by Dr. Marks himself. Scalabrini has presented evidence that could support the conclusion by a jury that Dr. Marks himself gifted Aitken his Intellectual Property directly. *See* Scalabrini Aff. at 2 (Dr. Marks wanted Aitken "to keep" the "stuff" from the lab); Deluca Dep. at 106:3-20 (Aitken said "that Alvin gave him the stuff"). Because a jury could conclude this based on the evidence presented, the plaintiff's arguments regarding limitations on the scope of Aitken's authority pursuant to the Power of Attorney would not be dispositive even if the Court agreed with plaintiff's position regarding the legal restrictions on transfers imposed under that document.

The plaintiff contends that the Power of Attorney only authorized Aitken to give gifts on Dr. Marks's behalf to specific people (his family and friends) on specific occasions, and therefore did not authorize Aitken to give himself the Intellectual Property. As an initial matter—and drawing all inferences in favor of Defendant, as the Court must at this stage—the purported gift here could reasonably be found to fit within the parameters of the gift transaction clause of the Power of Attorney. POA ¶ 10(m). All of the evidence before the Court supports the proposition that Dr. Marks considered Aitken to be his "son." One could reasonably conclude on this record that Aitken was a family member of Dr. Marks's—even if Aitken was not in fact his biological son. One could also reasonably conclude that closing down Dr. Marks's lab, which presumably housed his life's work, would have been considered by him to be a "special occasion." More significantly, however, the Power of Attorney separately authorized Aitken, as Dr. Marks's attorney-in-fact, to "do any act or thing that [Dr. Marks] could do . . . if personally present." POA ¶ 10(q). That provision of the Power of Attorney, unlike the gift transaction clause, does not limit transfers to family members or special occasions.

The plaintiff next argues that even if Aitken's authority to transfer the Intellectual Property was not limited by the Power of Attorney, he would have been unable to perform any act that Dr. Marks was legally unable to perform. The plaintiff asserts that the 1983 Agreement between Dr.

Marks and Ms. Strouse precluded Dr. Marks from making any disposition of the Intellectual Property without Ms. Strouse's consent.

As a preliminary matter, the 1983 Agreement purported to require Ms. Strouse's approval of any *agreements*, and a gift transferring property is, at least arguably, different than an agreement governing its use. *See* 1983 Agreement.[5] Moreover, while the 1983 Agreement restricted Dr. Marks's ability to make agreements regarding "Patent Rights and Royalties," it says nothing about his notebooks or other work product developing his technologies beyond the patents themselves. *Id.*

Moreover, the plaintiff's assumption that any transfer of the assets in violation of the 1983 Agreement would necessarily be void *ab initio* is unsupported. "Fundamentally, a patent is a property right," and "[t]his property interest . . . is freely assignable." *Ropes & Gray LLP v. Jalbert*, 454 Mass. 407, 410-11 (2009) (citations omitted). The 1983 Agreement purports to place a limitation on Dr. Marks's ability to make agreements concerning his patents, but does not provide that transfers of Dr. Marks's patents in violation of its terms are void. The plaintiff has cited to no authority that supports its argument that transfers in violation of the 1983 Agreement would be void *ab initio* in the absence of such a provision, and the Court has identified none. A violation of the 1983 Agreement may allow Ms. Strouse to assert a claim for breach of contract, but the plaintiff provides no legal support for its assumption that any transfer in violation of that agreement is necessarily void *ab initio. See, e.g., Sprague v. Rust Master Chemical Corp.*, 320 Mass. 668, 678 (1947) (effect of an assignment of

---

[5] The Court notes, although it need not decide the issue, that it is not clear on the record before the Court that the 1983 Agreement is a valid contract. "Elementary contract principles dictate that an enforceable agreement requires an offer, an acceptance, and an exchange of consideration." *Davis v. Davis*, 2007 Mass. App. Div. 123, 2007 WL 2409845 at *1 (Mass. Dist. Ct. 2007) (citing *Northrup v. Brigham*, 63 Mass. App. Ct. 362, 367 (2005)). There is no indication that Ms. Strouse provided any consideration. She pledged to "make no agreements with third parties" regarding her (purported) veto power over Dr. Marks's future transactions, but that veto power is given to her in the 1983 Agreement—she did not provide any "performance or a return promise" in exchange for it. *See* Restatement (Second) of Contracts § 71 (1981). The 1983 Agreement states that it is made in view of Dr. Marks and Ms. Strouse's "mutual family interests" in connection with Ms. Strouse's children. But "[a]ffection for a person and the desire to make a provision for him are not valid consideration for an . . . executory contract." *Davis*, 2007 WL 2409845, at *2 (citing *Drury v. Hartigan*, 312 Mass. 175, 177 (1942)). Nor can moral obligations serve as valid consideration. *Id.* (citing *Congregation Kadimah Toras-Moshe v. DeLeo*, 405 Mass. 365, 366 (1989)).

contract rights in violation of an agreement restricting assignment was "not to make the transfer null and void, but because of the transfer, to create a breach of the agreement") (citing *Merrill v. New England Mut. Life Ins. Co.*, 103 Mass. 245, 252 (1869)).

**B. Issues of Fact Exist Regarding Ownership of the Intellectual Property**

Genuine issues of material fact exist regarding whether Dr. Marks owned the Intellectual Property at the time of his death. The parties agree that Aitken possessed the tangible Intellectual Property at the time of Dr. Marks's death. We are left with the question whether Aitken was holding assets of the estate, or if Aitken had been gifted the Intellectual Property prior to Dr. Marks's death—either directly by Dr. Marks, or in a gift to himself, acting under the Power of Attorney. Under Massachusetts law, to give a gift there must be "donative intent on the part of the donor, together with an actual or symbolic delivery of the subject matter of the gift." *Silverman v. A. & L. Heel Corp.*, 353 Mass. 108, 110 (1967) (citations omitted). Since there is no dispute regarding whether the subject matter was delivered to Aitken, the question is whether the transfer to Aitken was intended as a gift.

**1. Evidence Before the Court**

Before considering whether Aitken gifted himself the Intellectual Property, the Court must address three threshold questions to define the universe of evidence that it may consider in deciding this motion: (1) whether and for what purposes the 2009 Agreement may be considered; (2) whether Deluca's and Aitken's statements are inadmissible hearsay; and (3) whether New York's dead man's statute renders certain statements in Scalabrini's affidavit inadmissible.

**a. The 2009 Agreement**

The parties disagree regarding the import and admissibility of the 2009 Agreement. The plaintiff contends that the 2009 Agreement has no legal impact on the estate's ownership of estate property, despite the fact that the plaintiff, Ms. Marks, signed the agreement in her individual capacity, together with her other family members. The plaintiff argues that the individual signatories

to that agreement were powerless to decide that Aitken owned estate property.  Scalabrini responds that Ms. Marks created a conflict of interest and is violating the 2009 Agreement by bringing this litigation.  Def.'s Reply Br. at 16-18, ECF No. 124.  The Court agrees with plaintiff that the signatories to the 2009 Agreement did not have the legal authority to decide whether the Intellectual Property was part of the estate.  *See T&S Wholesale, Inc.*, 1998 WL 247263, at *3 (citations omitted). However, the 2009 Agreement, like many other statements before the Court, may be considered as evidence of the signatories' state of mind at the time that they signed it.  F.R.E. 803(3).  According to the 2009 Agreement, Aitken was the sole owner of the "Technologies," defined in that document as "certain technologies created or improved by Alvin Marks, deceased, relating to Lumeloid and Quensor."  2009 Agreement at 1.  A jury will be able to evaluate that agreement, as it evaluates the parties' arguments in this case.

### b.  *Deluca's Testimony Regarding Aitken's Statements*

The plaintiff relies heavily on Deluca's deposition testimony, in which he recounted his communications with Aitken regarding the Intellectual Property.  It contends that this testimony is admissible because (1) Aitken's reliance on the will is a statement against interest, and (2) the testimony goes to Aitken's state of mind.  Pl.'s Br. at 11-12 n.3.

Plaintiff's first argument fails for two reasons.  Statements against interest are only admissible when the declarant is unavailable as a witness.  F.R.E. 804(a) and (b)(3).  At this point, the Court has no way of knowing whether Aitken will be available to testify at trial and "[t]he mere possibility that a hearsay statement will be admissible at trial[ ] does not permit its consideration at the summary judgment stage."  *Pavlica v. Behr*, No. 03-cv-9628, 2005 WL 3181586, at *2 (S.D.N.Y. Nov. 29, 2005) (Chin, J.) (citation omitted).  Second, statements against interests are those where "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, *when made*, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else

or to expose the declarant to civil or criminal liability." F.R.E. 804(b)(3)(A) (emphasis added). Aitken's statements to Deluca were not contrary to his interests at the time they were made—to the contrary, they were, according to the plaintiff's argument, made to further Aitken's interest as he stood to gain from doing business with EMC.

But because Aitken's statements to Deluca were statements of his "then-existing state of mind (such as motive, intent or plan)" they are, at a minimum, admissible under Federal Rule of Evidence 803(a). The Court observes, however, that as flagged below, Deluca's testimony regarding Aitken's statements provides support for Scalabrini's view of the facts as well as plaintiff's.

### c. *Applicability of the Dead Man's Statute*

Although the Federal Rules of Evidence generally determine the admissibility of evidence in federal court, "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." F.R.E. 601. Therefore, when deciding claims governed by New York law, "its statute barring the testimony of certain interested witnesses[ ] must be given effect." *Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) (citing H.R. Rep. No. 650, 93d Cong., 1st Sess. 9 (1973) (House Report)); *see also Clark v. Meyer*, 188 F. Supp. 2d 416, 420-21 (S.D.N.Y. 2002) (Federal Rule 56(e) "requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial.").[6] "Under the Dead Man's Statute, '[w]hen the witness is interested and his testimony involves a personal transaction with the

---

[6] The Court notes that the Dead Man's Statute "is widely criticized as a remnant of the common-law rule making interested persons incompetent to testify." *Rosenfeld*, 78 F.3d at 88. The 2007 Commentary to the CPLR states:

> The Legislature should abolish the Dead Man's Statute. The Chief Administrative Judge's Advisory Committee on Civil Practice has repeatedly urged such revocation, observing that the danger of perjury is diminished by the prospect of criminal penalties and the pursuit of vigorous cross-examination. 2007 Report of the Advisory Committee on Civil Practice 90-91. Furthermore, modern fact-finders, aided by a court's instructions, are capable of giving interested testimony its appropriate weight. At the very least, courts should have the discretion, in the interest of justice, to permit testimony otherwise within the statute's ban. *See, e.g.*, *Fridena v. Evans*, 1980, 127 Ariz. 516, 521 622 P.2d 463, 468.

Alexander, Practice Commentary, McKinney's Cons. Laws of NY, 2007 Electronic Update, C.P.L.R. § 4519.

decedent, his testimony with regard to that transaction is inadmissible, unless the estate has waived the bar of the statute." *Athineos v. Andromeda Investments Co., Ltd.*, No. 13-cv-5076-CM, 2015 WL 6467842, at *7 (S.D.N.Y. Oct. 23, 2015) (citing *Pro Bono Investments, Inc. v. Gerry*, No. 03-cv-4347-JGK, 2005 WL 2429777, at *7 (S.D.N.Y. Sept. 30, 2005)); N.Y. C.P.L.R. § 4519.

The claims that the plaintiff brings against Scalabrini are governed by New York law, thus, New York's dead man's statute applies.[7]   The Court cannot, therefore, consider the portions of Scalabrini's affidavit in which she recalls communications in which Dr. Marks told her that he was giving Aitken the Intellectual Property.   But Scalabrini's recollection of facts unrelated to "the personal presence of the deceased"—including her personal involvement in closing down the lab, and statements that Aitken made to her—are admissible.   *See Griswold v. Hart*, 205 N.Y. 384, 395 (1912) (holding that the statute excludes only "knowledge which [the witness] has gained by the use of his senses from the personal presence of the deceased.").

### 2.   There is a Genuine Dispute Regarding Whether Aitken was Gifted the Intellectual Property Prior to Dr. Mark's Death

There is a clear factual dispute as to whether Aitken owned the Intellectual Property prior to Dr. Marks's death.   The key issue is whether the transfer of the property to Aitken was intended (by either Aitken or Dr. Marks) as a gift, and questions of intent cannot generally be resolved on summary judgment.   *See Gelb v. Bd. of Elecs. of City of New York*, 224 F.3d 149, 157 (2d Cir. 2000) ("summary judgment is generally inappropriate where questions of intent and state of mind are implicated"); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."); *see also Clancey v. G.F. Wright Steel & Wire Co.*, No. 950239, 1998 WL 1182096, at *3 n.3 (Mass. Sup. Ct. April 1, 1998) ("Ordinarily,

---

[7] The Dead Man's Statute may not be used "as a sword rather than a shield." *Matter of Wood's Estate*, 52 N.Y.2d 139, 145 (N.Y. 1981).   If the Estate elicits testimony at trial from an interested party on the personal transaction at issue—the gift of the Intellectual Property—it will "open the door" regarding that transaction and Ms. Scalabrini will be permitted to testify regarding the transaction.   *Id.*

donative intent is a question of fact for the jury."). In order for the Court to decide a question of intent at the summary judgment stage, the record must be so one-sided that there is not "any evidence in the record that could reasonably support a jury's verdict" for the other party. *See Marvel Characters, Inc.*, 310 F.3d at 286. That is not the case here.

### Defendant's Motion for Summary Judgment

For Scalabrini to prevail on her motion for summary judgment, the Court would have to find that the record was devoid of any evidence that could reasonably support a jury's verdict in favor of the estate. Such a finding is impossible on the record before the Court. Aitken made representations that Dr. Marks has willed him property. *See* Ex. 15, Deluca Deposition 105:5-10 (Aitken told EMC he "was willed the stuff from Alvin Marks"). In addition, he filed an application in Massachusetts Probate Court attempting to probate the 2005 Will that purported to give him all of Dr. Marks's property. *See* Pl.'s Exs. 6, 13. These representations and actions alone would preclude a grant of summary judgment to Ms. Scalabrini, and they are far from a complete inventory of the proof proffered by the plaintiff.

### a.   Plaintiff's Cross-Motion for Summary Judgment

Because there is evidence in the record that could support a jury verdict in favor of Scalabrini, the Court must also deny the plaintiff's cross-motion for summary judgment. Although Aitken made representations that Dr. Marks willed him property, he has also made a variety of other statements. Specifically, he told Deluca "that Alvin gave him the stuff," Ex. 15, 106:3-20, and told Scalabrini that Dr. Marks wanted him "to keep this stuff [from the lab] but there is a lot of junk." Scalabrini Aff. at 2. In addition, in his affidavit before the probate court, Aitken stated his shares of EMC were "not even part of Alvin's estate" because EMC was "based upon work that has been in the public patent domain since 2001." Aitken Aff. ¶ 49. In connection with the probate proceeding, Aitken also provided an affidavit representing that the content of the estate at the time of Dr. Marks's death consisted of his personal belongings, $49.25 in his bank account, and the

Quensor patent.  *Id.* at ¶ 48.  Those statements could support a finding that the transfer of the Intellectual Property occurred before Dr. Marks's death.  Moreover, in the TPA, Aitken represented that he was the owner of the Intellectual Property.  TPA §4.2(b).  All of those representations were made prior to the probate of the 2005 Will and could support the conclusion that the assets were transferred to Aitken prior to Dr. Mark's death.

The plaintiff relies heavily on two facts on the record, asserting in essence that these facts are so persuasive they preclude the Court from concluding that there are genuine issues of material fact in this case.  But as described below, while plaintiff may find these facts persuasive, it is for the jury, not the Court, to weigh them in light of the other, contradictory facts in the record.

First, the plaintiff claims that Aitken acknowledged that Dr. Marks remained the owner of the Intellectual Property after Aitken took possession of the notebooks.  It bases this assertion on an email from Aitken to Ms. Marks, in which Aitken wrote that

> Dad has given me complete authority to handle all of his business affairs through a complete Power of Attorney.  As for ownership the family does not have the authority to make deals or stop Dad from making deals.  We are only entitled to benefit from what Dad makes in income from his technology . . . I have all the original documents and current documents and Alvin's total authorization and approval.

Pl.'s Ex. 16.  The plaintiff interprets this document as Aitken's express acknowledgement—after taking possession of the physical intellectual property—that Dr. Marks still owned the Intellectual Property.  Pl.'s Reply at 1-2, ECF No. 131.  But the plaintiff's interpretation of the evidence is only that—its interpretation.  The email says that Aitken has complete authority to act on Dr. Marks's behalf and that Dr. Marks's family cannot stop him from "making deals," but a jury could reasonably conclude that the email does not address the current ownership of the underlying technologies.  In addition, the email is dated April 24, 2006, and the evidence before the Court dates the closure of Dr. Marks's lab to the summer of 2006, and perhaps as late as November 2006.  Because the email predates the alleged gift, a jury may not view the email as the slam dunk that

plaintiff perceives it to be.  A jury must weigh this piece of evidence in light of all of the record evidence, not in isolation.

Second, the plaintiff argues that the fact that the Quensor patent is part of the estate "confirms that there is no factual dispute that Aitken did not have authority to enter into the TPA." Pl.'s Reply at 3; *see also* Aitken Aff. ¶ 48.  Again, the Court believes that a jury must evaluate this piece of evidence in light of the other facts in the case.  In doing so a jury may consider the complete language of the TPA, which grants EMC an option to purchase the Quensor IP, defined as "the Alternative Energy IP that is solely related to the Quensor application."  TPA Schedule 2.  A jury might reasonably conclude that even if one of the assets underlying this option—the Quensor patent—belonged to the estate, that fact would not conclusively compel the conclusion that Aitken lacked the authority to enter into the TPA, or resolve the dispute regarding his intent as to the Intellectual Property.  Plaintiff points to facts that may be helpful for its case, but they do not merit entry of summary judgment in its favor.

Both parties point to evidence that they claim to be dispositive, but the record contains evidence that could support a jury verdict for either party.  Whether Aitken was given a gift when he took possession of the tangible Intellectual Property in 2006 is a question for the jury.

## IV.  CONCLUSION

For the foregoing reasons, both Defendant's and Plaintiff's motions for summary judgment are DENIED.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 92 and 97.

SO ORDERED.

Dated:  September 2, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge